# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# NORTHERN DIVISION

DONOVAN JONES                                                                                   PLAINTIFF
ADC #149567

V.                                    No. 1:18CV00067-BSM-JTR

DAVID LUCAS, Sheriff,
Jackson County Sheriff Department, *et al.*                                           DEFENDANTS

## RECOMMENDED DISPOSITION

The following Recommended Disposition has been sent to United States District Judge Brian S. Miller. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection; and (2) be received by the Clerk of this Court within fourteen (14) days of the date of this Recommendation. If you do not file objections, Judge Miller may adopt this Recommendation without independently reviewing all of the evidence in the record. By not objecting, you may waive the right to appeal questions of fact.

## I. Introduction

On January 17, 2017, Plaintiff Donovan Jones ("Jones") was a pre-trial detainee in the Jackson County Detention Center (JCDC).[1] Mark Millbrooks

---

[1] "Pretrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment." *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007).

("Millbrooks"), an "Act 309" inmate,[2] entered Jones's housing pod to collect laundry, and a fight took place between Jones and Millbrooks.

Jones, proceeding *pro se*, later filed this § 1983 action against Defendants David Lucas, Travis Chapman, Johnathon Seals, Winter Kendall, Kurt Cooper, the Jackson County Jail, and the insurer of the Jackson County Jail. After screening the Complaint, the Court allowed Jones to proceed with: (1) his § 1983 failure to protect and state tort claims against Correctional Officer Johnathon Seals ("Defendant Seals") and Shift Sergeant Winter Kendall ("Defendant Kendall"); and (2) his § 1983 failure to protect, failure to train and supervise, delayed medical care and state tort claims against Sheriff David Lucas ("Defendant Lucas"). *Docs. 4 & 5.* Jones seeks an award of compensatory and punitive damages against the Defendants. *Doc. 2.*

Defendants have filed a Motion for Summary Judgment and a Statement of Undisputed Facts, along with supporting Exhibits, and a Brief in Support. *Docs 31–34.* Jones has filed a Response in Opposition to the Motion of Summary Judgment and a Response to the Statement of Undisputed Facts. *Docs. 36 & 37.* A video of the altercation has been filed under seal by Defendants and carefully reviewed by the Court. *Doc. 27 (sealed).* This video captures most of the altercation and is

---

[2] Act 309 is an inmate program operated by the Arkansas Department of Corrections, with cooperation from counties and cities. It allows State prison inmates who meet certain criteria to be housed temporarily in county or city operated detention facilities and perform certain services in and around the facility under the direction and supervision of the sheriff, chief of police or their designee. *Brown v. Moore*, 93 F. Supp. 3d 1032, 1037, n.4 (W.D. Ark. 2015).

indisputable evidence of what took place between Jones and Millbrooks in the common area outside of Jones's cell. *Id.*

## II. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986). When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party. *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002). The nonmoving party may not rely on allegations or denials but must demonstrate the existence of specific facts that create a genuine issue for trial. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007).

The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted). An assertion that a fact cannot be disputed or is genuinely disputed must be supported by materials in the record such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials ...". Fed. R. Civ. P. 56(c)(1)(A). A dispute is genuine if the evidence is such that it could cause a

reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment. *Sitzes v. City of West Memphis*, Ark., 606 F.3d 461, 465 (8th Cir. 2010).

Before reaching the merits of Defendants' Motion for Summary Judgment, the Court will review the undisputed material facts relevant to Jones's claims.

### III. Facts[3]

1. Jones entered the JCDC as a pre-trial detainee on June 8, 2016. *Doc. 37, ¶ 1*. At the time of the altercation on January 17, 2017, Jones was still a pre-trial detainee. *Doc. 37, ¶ 5*.

2. On January 27, 2017, Jones was sentenced to 240 months in prison. *Doc. 32, Exh. A at 22*. On February 2, 2017, Jones was transferred to the Arkansas Department of Corrections (ADC) to begin serving his sentence. *Id. at 28*.

3. In January of 2017, the JCDC housed several Act 309 inmates who performed maintenance, clerical, and other services, including cleaning and laundry. *Doc. 37, ¶ 4; Doc. 32, ¶ 5*.

---

[3] The sources for these undisputed facts are Defendants' Statement of Undisputed Facts and attached Exhibits; Jones's Response to Defendants' Motion for Summary Judgment and his Response to the Statement of Undisputed Facts; and the Video of the incident, which the Court has reviewed numerous times. Statement, *Doc. 32*; Responses, *Docs. 36, 37*; Video, *Doc. 27 (sealed)*.

4

4.      The Act 309 inmates were housed separately from other detainees in the JCDC but were permitted to enter jail pods to perform cleaning and laundry services. *Id.*

5.      "[E]arlier in the day," on January 17, 2017, Jones and Millbrooks got into an argument. According to Jones, Defendants Seals and Kendall "witnessed" this argument. *Doc. 36 at 1*.

6.      At approximately 11:45 p.m. on the night of January 17, 2017, Defendant Seals electronically unlocked the door to C-pod, from his guard station, to allow Millbrooks to retrieve dirty laundry from all the prisoners in C-pod. *Doc. 37, ¶ 9*. As a 309 inmate, retrieving dirty laundry from cells and washing it was part of Millbrooks authorized work.

7.      Once Millbrooks was inside C-pod, Defendant Seals electronically unlocked the door to Jones's cell so Millbrooks could get his laundry. *Doc. 37, ¶ 9*.

8.      The altercation between Jones and Millbrooks started inside the cell and is not captured in the video. *Doc. 37, ¶ 9; Doc. 27 (sealed)*. However, the combatants quickly moved into the common area in C-pod where the video shows what took place during their altercation. *Doc. 27 (sealed)*.

9.      Defendant Seals received a call on the C-pod intercom notifying him of the altercation, and he left his guard post and went to C-pod. *Doc. 37, ¶ 8 & 9*.

5

10. When Defendant Seals arrived at C-pod, the fight had ended and Millbrooks was walking away from Jones to exit C-pod. Jones threw a push broom at Millbrooks, reigniting the altercation. *Doc. 27 (sealed)*.

11. Millbrooks picked up the push broom and tried to hit Jones with it. Jones wrestled the broom away from Millbrooks and swung it at him. The altercation ended with Millbrooks exiting C-pod and Jones giving chase while swinging the broom at him. *Doc. 27 (sealed)*.

12. After the altercation, Defendant Seals contacted the jail administrator to inform him of the fight. Defendant Seals placed Jones and the other C-pod detainees in lock-down. Defendant Kendall escorted Millbrooks to his cell and placed him in lock-down.[4] *Doc. 37, ¶ 9; Doc. 32, Exh. 3, ¶ 2*.

13. The jail administrator arrived at the JCDC around 12:10 a.m. on January 18, 2017. He reviewed the video of the altercation and began an investigation. *Doc. 37, ¶ 13*.

14. Defendant Kendall, the shift sergeant on duty when the altercation occurred, did not witness the altercation. Defendant Lucas was not present in the JCDC on the night of the altercation. *Doc. 37, ¶ 10, 11*.

---

[4] It appears Defendant Kendall died on April 13, 2020. *See* "Suggestion of Death" filed April 17, 2020, and the attached copy of Kendall's obituary. *Doc. 41*.

15. Statements were obtained from Millbrooks, Jones, and two C-pod detainees who were in Jones's cell when the altercation began. *Doc. 37, ¶ 7; Doc. 32, Exh. 1 at 8, 9, 10–11, 13–16*.

16. The statements from Jones and the other C-pod detainees indicated that the fight was initiated by Millbrooks. *Doc. 32, Exh. 1 at 9, 10–11, 13–16*.

17. The statement from Millbrooks indicated that the fight was initiated by Jones. *Doc. 32, Exh. 1 at 8*.[5]

18. Defendant Seals wrote an Incident Report and submitted an Affidavit in support of Defendants' Statement of Undisputed Facts. In both of those documents, Defendant Seals stated that he did not witness the beginning of the altercation; and, when he arrived at C-pod, he saw Jones swinging a push broom at Millbrooks, who was about to exit C-pod. *Doc. 32, Exh. 1 at 6, 27; Doc. 32, Exh. 2*.

19. After the altercation, Millbrooks was no longer permitted to serve as Act 309 inmate at JCDC, and he was later returned to the ADC. *Doc. 32, Exh. 1 at 2–3; Doc 32, Exh. 2, ¶ 6*.

20. Before his altercation with Millbrooks on January 17, 2017, Jones did *not* inform Defendants Seals, Kendall, or Lucas that: (1) he feared Millbrooks; (2)

---

[5] When the altercation started, Millbrooks was accompanied by another Act 309 inmate, Broderick Jackson ("Jackson"), who was not involved in the fight between Millbrooks and Jones. Like Millbrooks, Jackson gave a statement in which he says Jones started the fight with Millbrooks. *Doc. 32, Exh. 1 at 7*.

7

Millbrooks had threatened him on January 17, 2017; or (3) he believed, based on Millbrooks's recent threat, he might attack him. *Doc. 32, Exh. 1 at 3*; *Doc. 32, Exh. 2, ¶ 7*; *Doc. 32, Exh. 3, ¶ 3*; *Doc. 37, ¶ 15*. The fight on January 17, 2017 was the first and only violent encounter between Jones and Millbrooks. *Doc. 32, Exh. 1 at 2–3*; *Doc. 32, Exh. 2, ¶ 6*.

21.   Prior to the altercation with Millbrooks, Jones did *not* inform Defendants Seals, Kendall, or Lucas that he believed his personal safety was at risk in the JCDC, *for any reason*, much less that Jones believed Millbrooks posed a risk to his personal safety. *Doc. 32, Exh. 1 at 3*; *Doc. 32, Exh. 2, ¶ 8*; *Doc. 32, Exh. 3, ¶ 4*; *Doc. 37, ¶ 16*.

22.   At no time prior to the altercation on January 17, 2017, did Jones make a request to Defendants (or any other JCDC staff member) to place Millbrooks on his enemy alert list. *Doc. 32, Exh. 1 at 3*; *Doc. 32, Exh. 2, ¶ 8*; *Doc. 32, Exh. 3, ¶ 4*; *Doc. 37, ¶ 16*.

23.   After the fight, Jones's only complaint was back pain. *Doc. 37, ¶ 20.*

24.   The next day, January 18, 2017, the JCDC medical care provider examined Jones and gave him a script for 24 hours of cold compresses (ice packs) and over-the-counter ibuprofen for 7 days. Jones stopped taking the ibuprofen after 4 days. *Doc. 37, ¶ 20; Doc. 32, Exh. 1 at 17.*

## IV. Discussion

### A. Official Capacity Claims

Jones seeks monetary damages from each Defendant, in both their "official" and "individual" capacities. *Doc. 2 at 16*. The doctrine of sovereign immunity bars Jones from recovering monetary damages against Defendants in their official capacities. *See Zajrael v. Harmon*, 677 F.3d 353, 355 (8th Cir. 2012); *Larson v. Kempker*, 414 F.3d 936, 939 (8th Cir. 2005). Accordingly, the Court recommends that all of Jones's claims against the Defendants, in their official capacities, be dismissed, with prejudice.

### B. Individual Capacity Claims

Defendants argue that they are entitled to summary judgment because all of Jones's individual capacity claims against them are barred by qualified immunity or fail as a matter of law. To "overcome the defense of qualified immunity," Jones must show that: (1) the facts, viewed in the light most favorable to him, demonstrate the deprivation of a constitutional right; and (2) the constitutional right was clearly established at the time of the deprivation. *Saylor v. Nebraska*, 812 F.3d 637, 643 (8th Cir. 2016); *Livers v. Schneck*, 700 F.3d 340, 350 (8th Cir. 2012).

#### 1. Individual Capacity Claim Against Defendant Kendall

Defendant Kendall died on April 13, 2020. *See Doc. 41*. For Jones's individual capacity claims against her to remain viable, Jones was required to file a motion to

substitute Defendant Kendall's estate as a party, within 90 days after her death was suggested from the record. *See* Rule 25(a)(1) of the Federal Rules of Civil Procedure. If no such timely motion to substitute is filed, "the action shall be dismissed as to the deceased party." *Id.*

On April 17, 2020, counsel for Defendant Kendall filed a suggestion of Death in this case and served it on Jones. *Doc. 41*. Despite being made aware of Defendant Kendall's death for more than nine months, Jones has not filed the required motion to substitute the estate of Defendant Kendall as a party to this action. Because the time for filing such a motion has long since expired, Jones's individual capacity claims against Defendant Kendall should be dismissed, with prejudice.[6]

## 2. Jones's Failure to Protect Claim Against Defendants Seals and Kendall[7]

Defendants Seals and Kendall argue that Jones's failure to protect claim is barred by qualified immunity. To overcome that defense, Jones must show that: (1) objectively, Defendant Seals's decision to allow Millbrooks to enter C-pod to collect laundry created "a substantial risk of serious harm" to Jones; and (2) subjectively,

---

[6]As explained in the next section, all of Jones's claims against Defendant Kendall are also barred by qualified immunity.

[7] Jones also alleged a failure to protect claim against Defendant Lucas. However, the undisputed facts establish that he was not at the JCDC when the fight occurred and had no personal knowledge about anything that took place between Jones and Millbrooks on January 17, 2017. Accordingly, Defendant Lucas is also entitled to qualified immunity on this claim.

Finally, Jones makes entirely conclusory allegations that Defendant Lucas failed to train and supervise Defendants Seals and Kendall. Because Defendants Seals and Kendall are entitled to qualified immunity on all of Jones's constitutional claims, Jones cannot maintain a plausible constitutional claim against Defendant Lucas for failing to train or supervise them.

10

Defendants Seals and Kendall knew of that risk and were "deliberately indifferent" to it. *Patterson v. Kelley*, 902 F.3d 845, 851–52 (8th Cir. 2018). An official is deliberately indifferent if he or she actually knows of the substantial risk and fails to respond reasonably to it." *Young*, 508 F.3d at 873. Negligence alone is insufficient to meet the second prong, instead, the official must "recklessly disregard a known, excessive risk of serious harm to the inmate." *Davis v. Oregon County*, 607 F.3d 543, 549 (8th Cir. 2010) (internal quotation marks and citation omitted).

According to Jones, because Defendants Seals and Kendall "witnessed" his argument with Millbrooks, earlier on the day of the fight, "objectively" they were aware that allowing Millbrooks inside C-pod created a "substantial risk of serious harm" to Jones; and, "subjectively," they knew the risk that Millbrooks might attack Jones, and they were "deliberately indifferent" to it.

It is undisputed that, after his argument with Millbrooks on January 17, 2017, Jones did *not* tell Defendants Seals and Kendall that Millbrooks had threatened him or that he believed Millbrooks might later attack him. Instead, Jones speculates that, because Defendants Seals and Kendall "witnessed" the argument, they somehow were on notice that Millbrooks posed a serious threat to Jones, and he might later attack Jones if he was allowed to enter C-pod.

Even if Defendants Seals and Kendall "witnessed" the argument between Jones and Millbrooks, it was *Jones's obligation* to let them know that he believed

11

Millbrooks posed a serious threat to his safety, and he believed he was at risk of being attacked by Millbrooks. Before the fight, Jones did *nothing* to notify Defendants Seals and Kendall, or anyone else that, after his argument with Millbrooks on January 17th, he believed he was in danger of being attacked, and he wanted Millbrooks's name placed on his enemy alert list. Thus, Jones has failed to show that Defendants Seals and Kendall were "objectively" aware of the "substantial risk of serious harm" Millbrooks posed to Jones if Millbrooks was later allowed to enter C-pod to collect dirty laundry.

Likewise, Jones has made no showing that Defendants Seals and Kendall "subjectively" *knew* the risk that Millbrooks might attack Jones and were deliberately indifferent to it. The undisputed facts establish that before their altercation: (1) there was no history of prior violent incidents between Jones and Millbrooks; (2) Jones did not notify Defendants Seals or Kendall that he felt threatened after his argument with Millbrooks on January 17, 2017; (3) Jones did not request that Defendants Seals or Kendall put Millbrooks on his enemy alert list; (4) Millbrooks did not have any prior incidents of violence against other JCDC prisoners before his altercation with Jones on January 17, 2017; and (5) when Millbrooks was allowed to enter C-pod, it was for the *authorized purpose* of collecting the dirty laundry, which was one of his assigned duties as an Act 309 inmate.

It is well known that "threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." *Prater v. Dahm*, 89 F.3d 538, 541–42 (8th Cir. 1996) (granting summary judgment to prison officials on inmate's failure to protect claim, finding prior threat of harm by inmate who later attacked plaintiff was insufficient to establish that prison guards actually knew of substantial risk of harm to plaintiff). During the argument between Jones and Millbrooks, which Defendants Seals and Kendall are alleged to have "witnessed," there was no physical confrontation or violence. Finally, any threat Millbrooks made was certainly *not* taken seriously *by Jones*. After the argument, Jones did nothing to notify anyone about Millbrooks's alleged threat against him, much less that Jones now supposedly believed Millbrooks might actually attack him.

In short, given these undisputed facts: (1) Jones's failure to protect claims against Defendants Seals and Kendall are facially implausible; and (2) Jones has made no showing that Defendants Seals and Kendall were "objectively" aware of any risk Millbrooks posed to Jones or that they "subjectively" knew the risk and were deliberately indifferent to it. Accordingly, Defendants Seals and Kendall are entitled to qualified immunity on Jones's failure to protect claims against them.

### 3. Jones's Claim Against Defendant Lucas For Violating JCDC Policies

Jones makes the conclusory allegation that, according to the policies of the JCDC, Defendant Lucas was prohibited from allowing Act 309 inmates to have any

13

direct contact with pre-trial detainees. Because Millbrooks was allowed to have contact with Jones, he alleges Defendant Lucas violated this policy. Jones also alleges this conduct by Defendant Lucas rises to the level of a violation of Jones's constitutional rights.

In Defendant Lucas's Affidavit, he states that: (1) Act 309 inmates are routinely permitted to enter JCDC housing pods, such as C-pod, to retrieve dirty laundry, distribute clean laundry, clean, and perform other services; and (2) there is no JCDC policy prohibiting Act 309 inmates, like Millbrooks, from having contact with pre-trial detainees. *Doc. 32, Exh. 1 at 2.* However, even if JCDC did have such a policy, the Eighth Circuit has "repeatedly held that violations of prison policy or regulations alone are not enough to establish deliberate indifference under the Eighth Amendment." *Vandevender v. Sass*, 970 F.3d 972, 978 (8th Cir. 2020) (citing *Jackson v. Gutzmer*, 866 F.3d 969, 977 (8th Cir. 2017); *Falls v. Nesbitt*, 966 F.2d 375, 380; *cf. Kulkay v. Roy*, 847 F.3d 637, 645 ("[S]afety regulations do not establish a standard for Eighth Amendment violations."). Thus, Jones's claim that Defendant Lucas violated JCDC policy, without more, is *not* sufficient to establish a constitutional violation. Accordingly, the Court recommends that Jones's claim against Defendant Lucas related to his alleged violation of JCDC policies, be dismissed, with prejudice.

## 4. Jones's Delayed Medical Care Claim Against Lucas

According to Jones, immediately after his fight with Millbrooks, he had a sore back, but was not allowed to receive medical care until the next day, about twelve hours after the altercation. He alleges that Defendant Lucas had a policy or custom of delaying medical care for JCDC detainees.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To plead a viable inadequate medical care claim against Defendant Lucas, Jones must allege that: (1) he had "objectively serious medical needs"; and (2) subjectively, Defendant Lucas "actually knew of but deliberately disregarded those needs." *Hamner v. Burls*, 937 F.3d 1171, 1177 (8th Cir. 2019).[8]

A medical need is objectively serious if it has been "diagnosed by a physician as requiring treatment" or if it is "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Barton v. Taber*, 908 F.3d 1119, 1124 (8th Cir. 2018). When a prisoner alleges that a delay in medical treatment violates his constitutional rights, the "objective seriousness of the deprivation should

---

[8] The Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S.Ct. 2466 (2015), caused some legal commentators to raise doubts about whether the deliberate indifference standard still applies to inadequate medical care claims brought by pre-trial detainees. In *Briesemeister v. Johnston*, 827 F. App'x 615, 616 n.2 (8th Cir. 2020), the Court made it clear that the deliberate indifference standard still applies in those cases.

15

also be measured 'by reference to the effect of delay in treatment.'" *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005); *see Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 2001) (a prisoner must demonstrate that the delay in obtaining medical treatment adversely affected his prognosis, or that defendants ignored an acute or escalating situation). Importantly, "the Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish." *Jenkins v. County of Hennepin, Minnesota*, 557 F.3d 628, 633 (8th Cir. 2009).

Here, Jones complained only of having a sore back following his fight with Millbrooks. The fight occurred just before midnight on January 17, 2017, and Jones received medical treatment the following afternoon. The JCDC medical care provider noted that Jones was continuing to complain of back pain and prescribed 24 hours of cold compresses (ice packs) and over-the-counter ibuprofen for 7 days. The record reflects that Jones stopped taking the ibuprofen after 4 days.

These undisputed facts establish that, at most, Jones back was sore after the fight, but the soreness resolved after about 4 days. Assuming Jones's minor back soreness rose to the level of an objectively serious medical need, it was appropriately treated within about 12 hours of the injury; it did not involve an acute or escalating medical situation; and there was no delay that adversely affected Jones's prognosis or recovery.

Accordingly, the Court recommends that Jones's delayed medical care claim

against Defendant Lucas be dismissed, with prejudice.

### 5. State Tort Claims

Because Jones's constitutional claims against all Defendants should be dismissed, the only claims remaining are state law tort claims. Under these circumstances, the Court should decline to exercise supplemental jurisdiction over the state law claims. *See* 28 U.S.C. § 1367(c)(3); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (providing that typically when all federal law claims have been dismissed before trial and only state law claims remain, a federal court should decline the exercise of jurisdiction by dismissing the case without prejudice).

### V. Conclusion

IT IS THEREFORE RECOMMENDED THAT:

1. Defendants' Motion for Summary Judgment (*Doc. 31*) be granted.

2. All of Jones's § 1983 clams against Defendants Seals, Kendall, and Lucas be dismissed, with prejudice.

3. All of Jones's state law claims be dismissed, without prejudice. [9]

DATED this 24th day of February 2021.

_____
UNITED STATES MAGISTRATE JUDGE

---

[9] If he chooses to do so, Jones can pursue those state law claims in Jackson County Circuit Court.